| | | |
|---|---|---|
| Christopher M. Roberts and<br>Thomas P. Fischer, | ) | |
| | ) | No. 16 C 02107 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| The Federal Housing Finance Agency, in | ) | |
| its capacity as Conservator of the Federal | ) | |
| National Mortgage Association and the | ) | |
| Federal Home Loan Mortgage Corporation; | ) | |
| Melvin L. Watt, in his official capacity as | ) | |
| Director of the Federal Housing Finance | ) | |
| Agency; The Department of the Treasury; | ) | |
| and Steven T. Mnuchin[1], in his official | ) | |
| capacity as Secretary of the Treasury, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Christopher Roberts and Thomas Fischer are shareholders of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). *See* R. 22, Am. Compl. ¶ 40.[2] Fannie Mae and Freddie Mac—both central figures in the United States' residential mortgage market—have been in conservatorship since the economic downturn of 2008; the Federal Housing Finance Agency (FHFA for short) is their conservator. *See id.* ¶¶ 38, 52.

---

[1]The current Secretary of the Treasury, Steven T. Mnuchin, is substituted for the former Secretary of the Treasury, Jacob J. Lew. *See* Fed. R. Civ. P. 25(d).

[2]Citations to the record are noted as "R." followed by the docket number and, if necessary, the page or paragraph number.

This case arises from FHFA's involvement, as the companies' conservator, with the Treasury Department. In 2008, FHFA entered into stock purchase agreements with Treasury on Fannie's and Freddie's behalf. Am. Compl. ¶ 56. Under these agreements, Treasury made hundreds of billions of dollars in capital available to the companies in exchange for shares of their preferred stock, which had a variable liquidation preference. *See id.* ¶¶ 56, 58, 61-62. The agreements obligated both Fannie and Freddie to pay Treasury a quarterly dividend equal to a fixed percentage of Treasury's liquidation preference. *Id.* ¶ 65. FHFA and Treasury later modified this dividend formula—in the Third Amendment to the stock purchase agreements—to require Fannie and Freddie to pay the quarterly dividend in an amount roughly equal to their net worth. *See id.* ¶ 113.

The Plaintiffs filed this lawsuit against FHFA and the Treasury Department,[3] principally alleging that, by adopting the new dividend formula in the Third Amendment, FHFA and Treasury had exceeded their statutory authority under the Housing and Economic Recovery Act of 2008 (for convenience's sake, the Recovery Act), Pub. L. No. 110-289, 122 Stat. 2654 (codified, as relevant here, in various sections of Title 12 of the United States Code), and Treasury had acted arbitrarily and capriciously, all in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)-(D). *See* Am. Compl. ¶¶ 169, 179, 191. The Defendants now move to dismiss the Plaintiffs' amended complaint, arguing (among other things) that a statutory provision in the Recovery Act bars the relief sought in this case. *See*

---

[3]The complaint also names the heads of FHFA and the Treasury Department in their official capacities, which is no different than suing the agencies themselves.

R. 39, Joint Mot. to Dismiss. For the reasons stated below, the Defendants' motion is granted and the case is dismissed with prejudice.

## I. Background[4]

### A. Fannie Mae and Freddie Mac

Fannie Mae and Freddie Mac are government-sponsored enterprises born from statutory charters issued by Congress. *See* 12 U.S.C. §§ 1716-1723 (Fannie Mae); *id.* §§ 1451-1459 (Freddie Mac); Am. Compl. ¶ 39. Congress created the companies to, among other things, "provide stability in the secondary market for residential mortgages" and "promote access to mortgage credit throughout the Nation … by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing." 12 U.S.C. § 1716(1), (3). Today, Fannie and Freddie are for-profit, stockholder-owned

---

[4]The Defendants have asked the Court to consider two categories of documents that were not attached to the Plaintiffs' amended complaint: (1) documents incorporated in the amended complaint by reference and (2) Securities and Exchange Commission filings. *See* R. 39-1, Joint Defs.' Br. at 10 n.1; R. 40, Treasury Defs.' Br. at 10 n.2. As a general matter, a court may not consider documents other than the complaint and documents attached to the complaint when deciding a motion to dismiss. *See* Fed. R. Civ. P. 12(d). There is, however, an exception for documents that have been referred to in a complaint, if they are central to the plaintiff's claims. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). A district court may also "take judicial notice of matters of public record" without converting a motion to dismiss into a motion for summary judgment. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (internal quotation marks omitted). To decide this motion to dismiss, the Court has considered the stock certificates issued pursuant to the stock purchasing agreements as well as the three amendments to the stock purchasing agreements, *see* R. 39-3, Senior Preferred Stock Certificates; R. 39-2, First Amendment; R. 39-4, Second Amendment; R. 39-5, Third Amendment, because their terms are repeatedly referenced in the amended complaint, *see* Am. Compl. ¶¶ 9-12, 18, 22-23, 29, 56, 61-79, 102, 110, 113-114, 116, 120-22, and are central to the Plaintiffs' claims. The Court has not considered any other documents encompassed by the Defendants' request, however, because the Defendants did not provide them to the Court and because it was not necessary to do so to decide the motion to dismiss.

corporations.[5] *See* Am. Compl. ¶¶ 2, 38. They purchase mortgages originated by private lenders and bundle them into mortgage-related securities that can be sold to investors. *Id.*

## B. The Housing and Economic Recovery Act of 2008

In the midst of the subprime mortgage crisis, Congress enacted the Recovery Act. *See* Am. Compl. ¶¶ 4, 45. The Recovery Act created FHFA, an independent agency with the power to supervise and regulate Fannie and Freddie. 12 U.S.C. § 4511. FHFA was authorized to place Fannie and Freddie into conservatorship or receivership "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs." *See id.* § 4617(a)(2). The Recovery Act also granted Treasury "[t]emporary" authority to "purchase any obligations and other securities issued by" Fannie and Freddie "on such terms and conditions as the Secretary [of Treasury] may determine and in such amounts as the Secretary may determine." *Id.* § 1455(l)(1)(A) (Freddie Mac); *id.* § 1719(g)(1)(A) (Fannie Mae). Treasury's temporary purchasing authority expired on December 31, 2009. 12 U.S.C. § 1455(l)(4) (Freddie Mac); *id.* § 1719(g)(4) (Fannie Mae). But the Act empowers Treasury to, "at any time, exercise any rights received in connection" with purchases completed before December 31, 2009. 12 U.S.C. § 1455(l)(2)(A), (D) (Freddie Mac); *id.* § 1719(g)(2)(A), (D) (Fannie Mae).

The Recovery Act grants FHFA expansive general powers when acting as conservator or receiver:

---

[5]Before entering conservatorship, Fannie and Freddie had both issued common stock and several series of preferred stock. Am. Compl. ¶ 40. Fischer owns Fannie and Freddie common stock, while Roberts owns Fannie and Freddie preferred stock. *Id.*

4

The Agency may, as conservator or receiver—

(i) take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity;

(ii) collect all obligations and money due the regulated entity;

(iii) perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver;

(iv) preserve and conserve the assets and property of the regulated entity; and

(v) provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver.

12 U.S.C. § 4617(b)(2)(B). In addition, FHFA is empowered to "transfer or sell any asset or liability of the regulated entity in default, and may do so without any approval, assignment, or consent with respect to such transfer or sale." *Id.* § 4617(b)(2)(G). Specific to the conservator role, FHFA "may … take such action as may be … (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(D). (As receiver, by contrast, "the Agency shall place the regulated entity in liquidation and proceed to release upon the assets of the regulated entity in such a manner as the Agency deems appropriate." *Id.* § 4617(b)(2)(E).) With respect to either role, FHFA "may" exercise any "incidental powers" necessary to carry out its enumerated powers, as well as "take any action authorized by [Section 4617], which the Agency determines is in the best interests of the regulated entity or the Agency." *Id.* § 4617(b)(2)(J). And, upon becoming either conservator or receiver, FHFA

"immediately succeed[s] to … all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." *Id.* § 4617(b)(2)(A).

In addition to giving FHFA those broad powers, the Act limits external interference with FHFA's actions as conservator or receiver. For example, the statute specifies that when acting in either role, "the Agency shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of the Agency." 12 U.S.C. § 4617(a)(7). And "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." *Id.* § 4617(f).

### C. Factual Background

On September 6, 2008—despite statements made by government officials suggesting that the companies were financially healthy, Am. Compl. ¶ 42—FHFA placed Fannie and Freddie into conservatorship. *Id.* ¶¶ 7, 52. The Plaintiffs claim that, at that point in time, neither Fannie nor Freddie were in financial distress or in danger of defaulting on their debts. *Id.* ¶¶ 52, 55.

The next day, Treasury exercised its statutory purchasing authority by entering into stock purchasing agreements with FHFA, which was acting in its role as Fannie's and Freddie's conservator. Am. Compl. ¶¶ 9, 56-57. Under the stock purchasing agreements, Treasury committed to provide each company up to $100 billion to ensure that both maintained a positive net worth. *Id.* ¶ 61. In exchange for

the capital infusion, Treasury received one million senior preferred shares in each company, as well as warrants to purchase 79.9% of their common stock. *Id.* ¶ 62. The senior preferred shares entitled Treasury to (1) a one-billion-dollar liquidation preference; (2) a dollar-for-dollar increase of the liquidation preference any time Fannie or Freddie drew upon Treasury's funding commitment; (3) quarterly dividends that Fannie or Freddie could pay at a rate of 10% of the liquidation preference or by increasing the liquidation preference by 12%; and (4) a quarterly periodic commitment fee.[6] *Id.* ¶¶ 63, 65, 72. The stock purchase agreements also contained a variety of covenants constraining the companies' (and FHFA's) actions. *See id.* ¶ 74. FHFA, for example, agreed not to terminate the companies' conservatorships without the prior written consent of Treasury. *Id.*

In May 2009, FHFA and Treasury executed the First Amendment to the stock purchasing agreements, which increased Treasury's total funding commitment from $100 billion per company to $200 billion per company. Am. Compl. ¶ 77. Then, in December 2009, FHFA and Treasury entered into the Second Amendment, which "established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012." *Id.* ¶ 79.

From the outset of the conservatorships, FHFA made assumptions about Fannie's and Freddie's future financial prospects that required the companies to

---

[6]Treasury repeatedly exercised its option under the stock purchase agreements to waive the commitment fee. Am. Compl. ¶ 72.

write down the value of significant tax assets and establish large loan reserves. Am. Compl. ¶¶ 81-83. As a result, both Fannie and Freddie reported non-cash losses which decreased their reported net worth by hundreds of billions of dollars. *Id.* ¶ 81. According to the Plaintiffs, these losses forced the companies to draw on Treasury's funding commitment, which thereby increased Treasury's liquidation preference. *See id.* ¶ 85. The companies also drew additional funds to pay cash dividends to Treasury (even though they could have elected to pay the dividends by increasing Treasury's liquidation preference). *See id.* ¶¶ 14, 85. To date, Fannie and Freddie have drawn a total of $187 billion from Treasury; around $26 billion of the total was used to pay the cash dividends. *Id.* ¶ 85.

Despite the establishment of the large loan reserves and the tax-assets write-down, by 2012 Fannie and Freddie had returned to profitability (and FHFA and Treasury were aware of this).[7] Am. Compl. ¶¶ 86-89, 92-98, 101-02. Yet, in August 2012, FHFA and Treasury executed the Third Amendment to the stock purchasing agreements. *Id.* ¶¶ 17, 102. The Plaintiffs allege that FHFA (as conservator) agreed to the Third Amendment at the insistence of Treasury, and that it is part of Treasury's "long-term plan" to keep the companies from emerging from conservatorship. *See id.* ¶¶ 103-07, 109-12, 133-34, 136, 138-40, 142-43.

The Third Amendment replaced the previous dividend formula with the requirement that Fannie and Freddie pay quarterly dividends in the amount of their entire net worth less a capital reserve amount that started at $3 billion and

---

[7]In the first two quarters of 2012, the companies posted profits totaling more than $11 billion. Am. Compl. ¶ 92.

will decrease to zero by January 1, 2018. Am. Compl. ¶ 113. As of the filing of the amended complaint, the companies had paid $129 billion more under this new dividend formula than they would have had to pay under the original dividend formula.[8] *Id.* ¶¶ 18, 128-29. Treasury has now recouped $245 billion, which is $58 billion more than it invested in Fannie and Freddie. *Id.* ¶¶ 18, 154. Dividend payments do not pay down Treasury's liquidation preference, so the liquidation preference today is $189 billion. *Id.* ¶ 155.

### D. Procedural History

The Plaintiffs brought this suit under the Administrative Procedure Act (the APA), claiming that FHFA exceeded its conservatorship authority under the Recovery Act by entering into certain provisions of the stock purchase agreements, as well as by agreeing to the new dividend formula under the Third Amendment. *See* Am. Compl. ¶¶ 158-69 (Count One). They also claim—only with regard to the Third Amendment's new dividend formula—that Treasury exceeded its temporary purchasing authority under the Recovery Act (Count Two) and acted arbitrarily and capriciously (Count Three). *See id.* ¶¶ 170-91. The Plaintiffs request declaratory and injunctive relief, but no monetary damages. *See id.* ¶ 192.

The Defendants have filed a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. *See* Joint Mot. to Dismiss. They assert a variety of grounds against the amended complaint, including a threshold issue, specifically, that judicial review of the Plaintiffs' claims is barred by 12 U.S.C. § 4617(f), as well

---

[8]Fannie and Freddie have elected to pay these dividends in cash, even though their net worth includes cash and non-cash assets. Am. Compl. ¶ 147. They have funded payment through the issuance of debt securities. *Id.*

as by 12 U.S.C. § 4623(d). The agencies also argue that the Plaintiffs lack standing in light of a provision in the Recovery Act, 12 U.S.C. § 4617(b)(2)(A)(i); that the Plaintiffs' claims are time-barred; and that the Plaintiffs' claims are barred by the doctrine of issue preclusion. *See* R. 39-1, Joint Defs.' Br.; R. 40, Treasury Defs.' Br.; R. 41, FHFA Defs.' Br.

## II. Standard of Review

In invoking 12 U.S.C. § 4617(f), which says that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver," the Defendants contend that subject matter jurisdiction has been withdrawn over the claims in this case. Joint Defs.' Br. at 17-19. But it is not clear that this provision is a *jurisdiction*-stripping statute, rather than a *merits*-based limit on the usual claims that a party might assert against a government agency. The Supreme Court has emphasized the need to draw the line carefully between lack of jurisdiction (which truly goes to the power of a court to hear a case) versus lack of merit (that is, a failure to state a claim for which relief can be granted). Practically speaking, however, it makes no difference here because the key point is that the allegations in the amended complaint must be accepted as true either way. Either the government is making a facial challenge to subject matter jurisdiction, in which case the allegations must be accepted as true (plus the Plaintiffs get the benefit of reasonable inferences), *see Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015), or the government is really arguing that Section 4617(f) prevents the Plaintiffs from stating a claim based on the amended complaint's

allegations—which again must be accepted as true, giving the Plaintiffs all reasonable inferences. In considering a similar anti-injunction provision involving the FDIC, 12 U.S.C. § 1821(j), the Seventh Circuit did not describe the obstacle to suit as a jurisdictional one, but rather as an obstacle to providing a remedy in a case over which the district court otherwise had subject matter jurisdiction, *see Courtney v. Halleran*, 485 F.3d 942, 948 (7th Cir. 2007). (In a later case, the Seventh Circuit noted that "some circuits frame Section 1821(j) as a jurisdictional inquiry," but it did not itself decide whether the anti-injunction provision is jurisdictional. *Veluchamy v. FDIC*, 706 F.3d 810, 817 (7th Cir. 2013).) Like § 1821(j), § 4617(f) does not use the word "jurisdiction." And the D.C. Circuit has assumed that § 4617(f) is a merits question, not a subject matter jurisdiction question. *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1085-86 (D.C. Cir. 2017) ("*Perry Capital (D.C. Cir.)*"). This Court also considers § 4617(f) to be a merits question, rather than a jurisdictional one, but to repeat, it makes no practical difference in this case.

### III. Analysis

The Defendants contend that 12 U.S.C. § 4617(f) prohibits the court from providing relief for Plaintiffs' claims. *See* Joint Defs.' Br. at 17-27; Treasury Defs.' Br. at 13-20; FHFA Defs.' Br. at 6-9. The Court agrees.[9]

The Plaintiffs have brought all three counts of their amended complaint under the Administrative Procedure Act—which generally authorizes judicial review of agency action—but the APA provisions on which the Plaintiffs rely do not

---

[9]Because the argument for dismissal under 12 U.S.C. § 4617(f) is independent of the other arguments that the Defendants have offered in support of their motion to dismiss, the Court need not address their remaining arguments.

apply where a substantive "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Here, § 4617(f) says that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver." That section no doubt is a limitation on judicial review; the question is, how broad is that limitation?

Although the Seventh Circuit has yet to comment on the scope of § 4617(f), that court has interpreted the nearly identical anti-injunction bar contained in the Financial Institutions Reform Recovery and Enforcement Act. *See* 12 U.S.C. § 1821(j) ("[N]o court may take any action … to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."); *see also Veluchamy*, 706 F.3d at 817-18; *Courtney*, 485 F.3d at 946-50. When interpreting that similar provision, the Seventh Circuit has said that 12 U.S.C. § 1821(j) "effect[s] a sweeping ouster of courts' power to grant equitable remedies," *Veluchamy*, 706 F.3d at 817 (internal quotation marks omitted), but only where the agency has acted within its statutory conservatorship or receivership authority, *see Courtney*, 485 F.3d at 948-49; *Chem. Futures & Options, Inc. v. Resolution Trust Corp.*, 832 F. Supp. 1188, 1192 (N.D. Ill. 1993). That is to say, if the agency has acted outside its statutory authority (or, to use the legal turn of phrase, "ultra vires"), then the anti-injunction bar in § 1821(j) will not apply. But if the FDIC acts within its statutory authority as a conservator or receiver, then courts cannot enter orders to restrain or affect the FDIC's conservatorship or receivership. This interpretation should apply to the virtually identical statutory text in § 4617(f),

which is the Recovery Act's version of the anti-injunction bar. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its … judicial interpretations as well." (internal quotation marks omitted)).

Although the Seventh Circuit has not yet interpreted § 4617(f), federal courts in other circuits have. *See, e.g.*, *Cty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 992-95 (9th Cir. 2013); *Leon Cty. v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1276-79 (11th Cir. 2012); *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227-28 (2d Cir. 2012). Indeed, some cases from other circuits have dealt with nearly identical claims brought by Fannie and Freddie shareholders against FHFA and Treasury. *See Perry Capital (D.C. Cir.)*, 848 F.3d at 1086-97; *Robinson v. Fed. Hous. Fin. Agency*, 2016 WL 4726555, at *3-8 (E.D. Ky. Sept. 9, 2016); *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 219-229 (D.D.C. 2014) ("*Perry Capital (D.D.C.)*"), *aff'd in part, rev'd in part sub nom. Perry Capital (D.C. Cir.)*, 848 F.3d 1072.[10] What the Seventh Circuit has said for the FDIC in applying § 1821(j), courts have said for FHFA and the Treasury Department in applying § 4617(f). *See Perry Capital (D.C. Cir.)*, 848 F.3d at 1086-87; *Cty. of Sonoma*, 710 F.3d at 992; *Leon Cty.*, 700 F.3d at 1278; *Town of Babylon*, 699 F.3d at 227-28; *Robinson*, 2016 WL 4726555, at *3-4; *Perry Capital (D.D.C.)*, 70 F. Supp. 3d at 220, 222.

---

[10]As out-of-circuit (and, for two of the three, district court) decisions, *Perry Capital (D.C. Cir.)*, *Perry Capital (D.D.C.)*, and *Robinson* are not binding on this Court. But they are well-reasoned and persuasive in interpreting § 4617(f).

13

Because the Plaintiffs in this case seek only equitable relief, their claims must be dismissed unless FHFA acted beyond the scope of its powers as conservator. And whether FHFA acted beyond the scope of its powers depends, in part, on whether Treasury acted within the scope of its statutory purchase authority. For if Treasury entered into the Third Amendment in contravention of the Recovery Act, "then FHFA is functionally complicit in its counterparty's misconduct," and Treasury's ultra vires conduct is imputed to FHFA. *See Perry Capital (D.D.C.)*, 70 F. Supp. 3d at 222; *see also Robinson*, 2016 WL 4726555, at *3 n.1 ("The Court recognizes that FHFA might also be subject to suit if Treasury exceeded its statutory authority in executing the Third Amendment."). But if neither Treasury nor FHFA acted outside their respective grants of authority, then § 4617(f) bars this lawsuit.

The Plaintiffs argue that § 4617(f) only bars claims for equitable relief against *FHFA*—so it cannot be used in this case to dismiss the claims against Treasury. It is true that, in limiting court action, the specific government agency referred to in § 4617(f) is FHFA. But the breadth of the ban is not so cramped as the Plaintiffs allege. Instead of disabling courts from entering orders directed at FHFA and only FHFA, the statutory text goes further: courts can take no "action" that would "restrain"—or even "*affect*"—"the exercise of powers or functions of" FHFA as a conservator. 12 U.S.C. § 4617(f) (emphasis added). So it is not just *FHFA* that is off limits, but also any court order that would *affect* the *exercise* of FHFA's powers or functions.

Here, the Plaintiffs' prayer for relief seeks, among other things, a declaration that the new dividend formula from the Third Amendment is invalid; an injunction returning dividend payments made according to the new formula to Fannie and Freddie; an injunction preventing Treasury from implementing the new formula; and vacatur of the Third Amendment. *See* Am. Compl. ¶ 192. All of these requests for relief would "restrain or affect" the exercise of FHFA's powers as conservator. Impeding the enforcement of the Third Amendment "affect[s]" FHFA's ability to "conduct all business" for the companies, 12 U.S.C. § 4617(b)(2)(B)(i), enter into contracts on their behalf, *id.* § 4617(b)(2)(B)(v), and "take any action authorized by [§ 4617], which [FHFA has] determine[d] is in the best interests of the [companies] or [FHFA]," *id.* § 4617(b)(2)(J)(ii). And because FHFA is a party to the Third Amendment, granting the requested relief against *Treasury* also "would have just as direct and immediate an effect as if the injunction operated directly on FHFA." *Perry Capital (D.C. Cir.)*, 848 F.3d at 1096. It takes two to tango, and undoing one side of the Third Amendment against Treasury necessarily affects FHFA, which is, after all, the other party to the Third Amendment. So § 4617(f) can operate to bar claims against Treasury, so long as FHFA and Treasury acted within their legal authority.

One final point before turning to whether the Plaintiffs have sufficiently alleged that either FHFA or Treasury acted outside the scope of its authority. When considering whether FHFA or Treasury has acted ultra vires, the agencies' motives

are irrelevant.[11] *See Perry Capital (D.C. Cir.)*, 848 F.3d at 1093 ("[F]or purposes of applying Section 4617(f)'s strict limitation on judicial relief, allegations of motive are neither here or there…."); *Cty. of Sonoma*, 710 F.3d at 993 ("[I]t is not our place to substitute our judgment for FHFA's…."); *Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 840 n.6 (S.D. Iowa 2015) ("[I]t is not the role of this Court to wade into the merits or motives of FHFA and Treasury's actions—rather the Court is limited to reviewing those actions on their face and determining if they were permissible under the authority granted by the [Recovery Act]."); *Perry Capital (D.D.C.)*, 70 F. Supp. 3d at 226 ("FHFA's underlying motives or opinions … do not matter for the purposes of § 4617(f)."); *see also Robinson*, 2016 WL 4726555, at *6-7; *cf. Gross v. Bell Sav. Bank PA SA*, 974 F.2d 403, 408 (3d Cir. 1992) (holding with respect to 12 U.S.C. § 1821(j) that "the availability of injunctive relief does not hinge on [the court's] view of the proper exercise of otherwise-legitimate power").

Section 4617(f) prohibits courts from restraining the "exercise of [FHFA's] powers or functions"—it makes no exception for instances when FHFA supposedly had an improper motive but acted within its authority. Nothing in the Recovery Act limits FHFA to exercising its powers only when it has proper "motives," as the Plaintiffs seem to think. Nor must FHFA act with a motive that exclusively favors the interests of Fannie or Freddie. Instead, the Recovery Act permits FHFA to "take

---

[11]The Plaintiffs cite *Leon County v. Federal Housing Finance Agency*, 700 F.3d 1273 (11th Cir. 2012), as supporting the proposition that FHFA's "purpose" might be relevant to whether it acted within the scope of its statutory authority. R. 46, Pls.' Resp. Br. at 22. But *Leon County* says that a court should consider purpose (among other things) when determining whether FHFA took a particular action as a conservator or as a regulator, *see* 700 F.3d at 1278, *not* when determining whether FHFA's actions as a conservator were within the scope of its statutory powers as a conservator.

any action authorized by [§ 4617], which the Agency determines is in the best interests of the regulated entity *or the Agency*," *see* 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added).

With the parameters of § 4617(f) in place, the Court now addresses whether FHFA or Treasury acted outside their statutory authority.

### A. FHFA

The Plaintiffs allege that FHFA exceeded its statutory authority in a variety of ways when it entered into the Third Amendment, *see* Am. Compl. ¶¶ 158-68, but their allegations can be distilled into two sets of arguments. First, they claim that FHFA entered into the Third Amendment "at the insistence and under the direction and supervision of Treasury" and have "cede[d] substantial control over the operation of Fannie and Freddie in conservatorship to Treasury," in violation of 12 U.S.C. § 4617(a)(7). *Id.* ¶¶ 163, 167; *see also* R. 46, Pls.' Resp. Br. at 24-26. Second, they assert that entering into the Third Amendment was "inimical" to FHFA's core mandates as conservator, in particular its statutory obligations to "put the [companies] in a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D)(i), and to "preserve and conserve [their] assets and property," *id.* § 4617(b)(2)(D)(ii). Am. Compl. ¶¶ 160-62, 165-66, 168; Pls.' Resp. Br. at 27-35. Neither of these arguments has merit.

### 1. Section 4617(a)(7): Other-Agency Direction

The Plaintiffs first argue that FHFA's interactions with Treasury run afoul of 12 U.S.C. § 4617(a)(7). Section 4617(a)(7) says that FHFA, "[w]hen acting as conservator or receiver … shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of the agency." The Plaintiffs believe that FHFA violated this provision in two ways: (1) FHFA "subject[ed] itself to Treasury's will" when it entered into the Third Amendment, and (2) FHFA ceded "extraordinary control" over the companies' operation when it entered into the stock purchase agreements (a fact that was exacerbated by the Third Amendment). Pls.' Resp. Br. at 24-25. But other than making the conclusory allegation that Treasury had a long-term plan to "seize" Fannie and Freddie for the "exclusive benefit" of the federal government, *see* Am. Compl. ¶ 133, the Plaintiffs have alleged no *facts* from which it can be reasonably inferred that something like that actually happened. At most, on the facts alleged, Treasury came up with the idea for the new dividend formula in the Third Amendment and proposed it to FHFA. Formulating a plan and proposing it to FHFA does not mean that Treasury was subjecting FHFA to its "direction" or "supervision." As the district court pointed out in *Perry Capital (D.D.C.)*, "[u]ndoubtedly, many negotiations arise from one party conjuring up an idea, and then bringing their proposal to the other party." 70 F. Supp. 3d at 227. FHFA simply did not, on the facts alleged, violate § 4617(a)(7) by entering into the Third Amendment.

Nor did it violate § 4617(a)(7) by entering into the stock purchase agreements. The Plaintiffs point out that the agreements contain covenants prohibiting FHFA from taking certain actions with respect to the companies without the prior written consent of Treasury. *See* Am. Compl. ¶ 74. This might be problematic—except that Treasury's actions were contemplated by the Recovery Act itself. At the same time that Congress enacted § 4617(a)(7), it authorized Treasury to purchase securities from Fannie and Freddie "on such terms and conditions as the Secretary [of Treasury] may determine." 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A). In doing so, it made clear that Fannie and Freddie could not be forced to issue securities "without mutual agreement" between the companies and Treasury. *Id.* ("Nothing in this subsection requires the corporation to issue obligations or securities to the Secretary without mutual agreement between the Secretary and the corporation."). Sections 1455(l)(1)(A) and 1719(g)(1)(A) must be read in harmony with Section 4617(a)(7). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." (internal quotation marks and citations omitted)). Together, the provisions protect FHFA (in its role as conservator for the companies) from being subject to Treasury's supervision and direction *against FHFA's will*, but they

do not prevent FHFA from voluntarily entering into to a purchase agreement that gives Treasury a say in decisions that would impact Treasury's investment.

## 2. Conservator Duties

Contrary to the Plaintiffs' arguments, Pls.' Resp. Br. at 16, FHFA did not violate any "core statutory mandates" as conservator—largely because these mandates do not exist, at least not as the Plaintiffs have alleged. The Plaintiffs say that, by using the term "conservatorship," Congress injected longstanding, preexisting conservatorship principles into the Recovery Act. *See id.* at 27. It is true that courts presume that where a well-established term has been used in a statute, Congress intended that term to have its customary meaning. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). But this presumption does not apply where Congress has employed the term in a fashion that contravenes that established meaning. *See id.* And here Congress did not set up a typical conservatorship. This is best evidenced by the fact that FHFA is empowered, in its role as conservator, to act in *its own best interests*. *See* 12 U.S.C. § 4617(b)(2)(J)(ii). As a result, the ordinary understanding of a conservator is irrelevant to whether FHFA acted outside the bounds of its statutory authority, and the Court must look to the statute's text to determine the scope of the agency's powers and responsibilities as conservator.

Section 4617(b)(2)(D) says that FHFA "*may*, as conservator, take such action as may be— (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C.

§ 4617(b)(2)(D) (emphasis added). The Plaintiffs maintain that these are "obligations" that FHFA contravened by entering into the Third Amendment. *See* Pls.' Resp. Br. at 30. But § 4617(b)(2)(D) uses the permissive term "may," not the compulsory term "shall," which makes the actions listed discretionary rather than obligatory. The structure of the statute supports this interpretation. Section 4617(b)(2)(D) is entitled "Powers as conservator," and it is nestled under the heading "General powers." 12 U.S.C. § 4617(b)(2). Both of these headings fall under the subsection setting forth "Powers and duties of the Agency as conservator or receiver." *Id.* § 4617(b). The differences between the three provision headings suggests that (1) "powers" are different than "duties," and (2) § 4617(b)(2)(D) grants power in lieu of creating a duty. Ultimately, FHFA cannot be said to have violated a duty that did not exist.

Even if § 4617(b)(2)(D) required FHFA to take action to put Fannie and Freddie in a "sound and solvent condition" and to "preserve and conserve" their assets and property—to the exclusion of other interests—the agency still did not act ultra vires. The Plaintiffs admit that, under FHFA's conservatorship, the companies have returned to profitability. Am. Compl. ¶ 18. And Treasury's funding commitment guarantees that Fannie and Freddie will remain solvent. *See id.* ¶ 61 (noting that the purpose of Treasury's commitment was to ensure that the companies maintain a positive net worth). What's more, nothing in the Act says that FHFA must preserve and conserve assets in order to guarantee that the companies can pay dividends to non-Treasury shareholders or can return to private

control. *See Perry Capital (D.C. Cir.)*, 848 F.3d at 1090. Indeed, FHFA can operate the companies as a conservator in anticipation of moving onto receivership. *See* 12 U.S.C. § 4617(a)(4)(D). All told, the Plaintiffs have not sufficiently alleged that FHFA acted outside the bounds of its statutory authority.[12]

## B. Treasury Department

Lastly, the Plaintiffs allege that Treasury exceeded its statutory purchase authority when it entered into the Third Amendment because (1) its purchase authority had expired; and (2) it disregarded its fiduciary duties to the companies' minority shareholders. *See* Pls.' Resp. Br. at 46-53. Neither of these arguments have merit. There is zero hint in the Recovery Act, or anywhere else, that Congress intended for state-law-type fiduciary duties to apply to Treasury in the exercise of its Recovery Act purchase authority. *See Robinson*, 2016 WL 4726555, at *4 n.3. And the Third Amendment was an exercise of rights received in connection with securities it had purchased before its purchase authority expired, *see* 12 U.S.C. § 1455(1)(2)(A), (D); *id.* § 1719(g)(2)(A), (D), not a *new* purchase. The previous agreements gave Treasury (and FHFA) the right to amend the agreements at a later date. *See, e.g.*, R. 39-2, First Amendment at 13. And the Third Amendment substituted one dividend obligation for another; it did not increase Treasury's funding commitment or entitle Treasury to new securities. *See Robinson*, 2016 WL

---

[12]For the same reasons that FHFA did not violate any core mandates as conservator when it entered into the Third Amendment, FHFA did not act ultra vires with respect to those aspects of the stock purchase agreements that the Plaintiffs say were exacerbated by the Third Amendment.

4726555, at *4; *Perry Capital (D.D.C.)*, 70 F. Supp. 3d at 224. No new purchase occurred.

In sum, under the facts alleged, neither FHFA nor Treasury acted outside the scope of its authority under the Recovery Act.[13] Section 4617(f) bars this court from granting relief for the Plaintiffs' claims, and the Defendants' motion to dismiss is granted.

## IV. Conclusion

For the reasons discussed, the Plaintiffs' amended complaint is dismissed. The dismissal is with prejudice because the Plaintiffs' have already amended the complaint and they offer no additional possible amendments to get around the bar of Section 4617(f). A separate judgment shall be entered, and the status hearing of April 4, 2017 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 20, 2017

---

[13]The Defendants also argue that subsequent legislation by Congress has impliedly endorsed the Third Amendment. *See* Treasury Defs.' Br. at 18-20; FHFA Defs.' Br. 6-9. In light of the Court's holding, there is no need to investigate this post-enactment legislative history, nor offer a conclusion on the value (if any) of appropriations bills as evidence of congressional approval of agency action.